**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| Bosch Automotive Service Solutions LLC,<br><br>Plaintiff,<br>v.<br><br>Shenzhen XTOOLTech Intelligent Co., Ltd.,<br><br>Defendant. | **Case No. 2:26-cv-00828**<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Bosch Automotive Service Solutions LLC (hereinafter "Plaintiff" or "Bosch Automotive") hereby files this Complaint for patent infringement against Defendant Shenzhen XTOOLTech Intelligent Co., Ltd. (hereinafter "Defendant" or "XTOOL"), and alleges as follows. The allegations herein are made based on personal knowledge as to Bosch Automotive with respect to its own actions, and upon information and belief as to all other matters.

## NATURE OF THE ACTION

1. This is a civil action for patent infringement arising under the patent laws of the United States, 35 U.S.C. § 1 *et seq.*

2. Bosch Automotive is a leader in the research, development, and design of products for automotive repair and maintenance. Among its many innovations, Bosch Automotive has pioneered numerous advances in vehicle diagnostic devices. These devices communicate with vehicular electronic systems and have become critical to the reliable operation and repair of the increasingly complex electronic systems in modern vehicles.

3. For decades, Bosch Automotive has invested extensively in U.S.-based research and development of vehicle diagnostic devices and, as a result, has secured numerous patents on

its innovative designs and solutions, including U.S. Patent Nos. 7,592,903, 8,072,320, 8,396,622, 7,987,028, 8,473,145 (collectively, the "Asserted Patents"). The innovations of the Asserted Patents allow for efficient and targeted repairs of critical systems, such as engine cooling and performance systems, as well as tire pressure systems and sensors with real-time monitoring, resulting in improved overall vehicular performance, safety, and reliability.

4. Defendant is a late entrant in the vehicle diagnostic device market. On information and belief, Defendant was formed in China in 2010 and entered the U.S. market in 2016.

5. On information and belief, Defendant manufactures its vehicle diagnostic devices in China and has, for over 10 years, repeatedly and consistently targeted the U.S. market by importing those devices into the U.S. for purchase by U.S. consumers, directly from Defendant or through its intermediaries, and for ultimate use by customers in the U.S., this State, and this District.

6. On information and belief, when it elected to enter the vehicle diagnostic device market, Defendant did not develop its own innovations. Rather, on information and belief, Defendant chose to copy Bosch Automotive and infringe the Asserted Patents.

7. Defendant's infringement is widespread. Defendant's infringing products include its entire portfolio of vehicle diagnostic tools, including at least each of the products listed below and any other substantially similar products that infringe in the same or similar way as described herein (collectively, "Accused Products").

a. Tire Pressure Scanners – including TP580; TP500; TP380; TP300; TP150; and IP819TP (collectively, "Accused Tire Pressure Scanners")

b. Diagnostic D Series – including D5; D5S; D6; D6S; D7; D7S; D7W; D7X; D7BT; D8; D8BT; D8S; D8W; D9; D9 PRO; D9S; D9S PRO; D9 MAX; D9EV; and D9HD (collectively, "Accused Diagnostic D Series")

c. Diagnostic A Series – including AD20; AD20 PRO; A30; A30 PRO; A30M V2.0; A30D; A80; A80 PRO; and A80 PRO MASTER (collectively, "Accused Diagnostic A Series")

d. Diagnostic IP Series – including IP919; IP919 PRO; IP919 MAX; IP900; IP900S; IP900BT; IP819; IP616; IP608; IP508; IP508S; IP500-BCC; IP500-BMR; IP500-DJC; and IP500-TLS (collectively, "Accused Diagnostic IP Series")

e. Gasoline Diagnostic Series – including XT90; XT80W; XT80; XT70W; XT70; XT50; Prodigy; Compass; and Compass Master (collectively, "Accused Gasoline Diagnostic Series")

f. EV Diagnostic Series – including N9EV 2; E2 Pro; and E2S (collectively, "Accused EV Diagnostic Series")

g. Key Programmers – including X100 MAX; X100 MAX 2; IK618; X100 PADS; X100 PAD3; and X100 PAD3 SE (collectively, "Accused Key Programmers")

8. Defendant's infringement of Bosch Automotive's Asserted Patents has caused and will continue to cause significant harm to Bosch Automotive. Bosch Automotive seeks relief from this Court to remedy that harm.

## **PARTIES**

9. Bosch Automotive is a Delaware limited liability company, with a principal place of business at 15000 N. Haggerty Road, Plymouth, MI 48170.

10. On information and belief, Defendant is a corporation organized and existing under the laws of the People's Republic of China. On information and belief, Defendant has a principal place of business at 17&18/F, A2 Building, Creative City, Liuxian Avenue, Nanshan District, Shenzhen, China.

## JURISDICTION AND VENUE

11. Bosch Automotive repeats and re-alleges the allegations in the Paragraphs above as though fully set forth in their entirety.

12. This Court has subject matter jurisdiction over the patent infringement claims in this case pursuant to 28 U.S.C. §§ 1331 and 1338(a).

13. This Court has personal jurisdiction over Defendant consistent with the requirements of the Due Process Clause of the U.S. Constitution and the Long-Arm Statute of the State of Texas because it directly and/or through subsidiaries or agents imports, ships, distributes, offers for sale, sells, uses, and advertises (including offering products and services through its websites and stores) the Accused Products in the U.S., Texas, and this District.

14. This Court also has personal jurisdiction over Defendant consistent with the requirements of the Due Process Clause of the U.S. Constitution and the Long-Arm Statute of the State of Texas because it directly and/or through subsidiaries or agents induced its customers to commit acts of infringement in the U.S., Texas, and this District.

15. This Court also has personal jurisdiction over Defendant consistent with the requirements of the Due Process Clause of the U.S. Constitution and the Long-Arm Statute of the State of Texas because it directly and/or through subsidiaries or agents contributed to its customers' acts of infringement in the U.S., Texas, and this District.

16. Defendant has availed itself of the privilege of conducting and soliciting business within Texas, including committing acts of patent infringement in this State and in this District, such that it would be reasonable for this Court to exercise jurisdiction consistent with principles underlying the U.S. Constitution and such that the exercise of jurisdiction by this Court would not offend traditional notions of fair play and substantial justice.

17. For example, Defendant's Accused Products are available for sale, offered for sale, sold, and advertised to consumers in this State and in this District, including through Defendant's XTOOL websites and stores.[1] On information and belief, Defendant owns, operates, and/or controls the XTOOL websites and stores. Defendant's XTOOL websites and stores also include user manuals, educational videos, and other instructions for how to infringe the Asserted Patents in the U.S., this State, and this District. On information and belief, Defendant has derived substantial revenue from its infringing acts in this State and this District.

18. In addition, for example, public import records show that Defendant has directly and repeatedly targeted Texas by intentionally importing and shipping the Accused Products into Texas, specifying their final shipping destinations in Texas.

19. As another example, Defendant imports, ships, and distributes the "D8S," an Accused Product, into the U.S. and specifically into this State.

20. For example, an accused D8S product sold by Defendant and marked with Defendant's name was purchased from the XTOOL websites and stores and shipped by Defendant, directly and/or through subsidiaries or agents, to Texas. The label for the "D8S" shows that it is manufactured by Defendant in China and shipped by Defendant, directly and/or through subsidiaries or agents, to the U.S. for sale and/or use in Texas.

[1] *See, e.g.*, *Xtooltech USA Inc.*, https://www.xtooltech.us/; *XTOOL Official Website*, https://www.xtooltech.com/; *XTOOL Official Store*, https://www.xtoolglobal.com/ (collectively, "XTOOL websites and stores").




21. Defendant, directly and/or through subsidiaries or agents, ships the D8S product to Texas with manuals and instructions bearing Defendant's name for instructing consumers how to use the D8S product in an infringing manner.

22. As another example, Defendant imports, ships, and distributes the "TP500," an Accused Product, into the U.S. and specifically into this State.

23. For example, an accused TP500 product sold by Defendant and marked with Defendant's name was purchased from the XTOOL websites and stores and shipped by Defendant, directly and/or through subsidiaries or agents, to Texas. The label for the "TP500" shows that it is manufactured by Defendant in China and shipped by Defendant, directly and/or through subsidiaries or agents, to the U.S. for sale and/or use in Texas.




24. Defendant, directly and/or through subsidiaries or agents, ships the TP500 product to Texas with manuals and instructions bearing Defendant's name for instructing consumers how to use the TP500 product in an infringing manner.

25. On information and belief, in a similar manner to the D8S and TP500, Defendant imports, ships, and distributes all other Accused Products into the U.S. and specifically into this State, including with manuals and instructions bearing Defendant's name for instructing consumers how to use the Accused Product in an infringing manner.

26. Moreover, Defendant, directly or through and in concert with its subsidiaries, agents, partners, intermediaries, and/or distribution network, purposefully and voluntarily placed one or more of its Accused Products in the U.S. stream of commerce, with the intention, belief, and expectation that they will be purchased and used by consumers such as automotive repair shops, independent mechanics, and vehicle owners in this State and this District.

27. For example, Defendant, under FCC ID 2AW3IAD20, also has applied for several authorizations from the Federal Communications Commission for the Accused Products. On information and belief, Defendant applied for the FCC authorizations because the Accused Products emit radio frequencies, and FCC authorization is required to allow Defendant to market,

import, sell, offer to sell, make, and use the Accused Products in the U.S. Defendant has availed itself of the laws of the U.S. to ensure that it can profit from sales, use, and marketing of its imported products in the U.S., this State, and this District.

28. As a further example, on information and belief, Defendant routinely attends trade shows in the U.S. as an additional means of delivering the Accused Products into the stream of commerce with the intention, belief, and expectation that consumers in Texas and this District will purchase and use the Accused Products here. As one exemplary trade show, Defendant attended the Specialty Equipment Market Association show at Booth #12119 in Las Vegas, Nevada in November 2025 where it demonstrated and marketed the Accused Products.

29. Defendant's targeted effort to sell its Accused Products in the U.S., this State, and this District is also underscored by its partnership with direct and/or indirect customers, including Amazon, Walmart, and eBay, to deliver the Accused Products to the U.S. stream of commerce with the intention, belief, and expectation that consumers in Texas and this District will purchase and use the Accused Products here.

30. For example, Defendant has an official online store with Amazon.[2] Through the official XTOOL Amazon store, which is available to and accessed by users, customers, and potential customers of Defendant in this State and in this District, the Accused Products are sold, offered for sale, and advertised to consumers in this State and this District. On information and belief, Defendant has the belief and expectation that the Accused Products will be purchased by consumers in this State and in this District.

[2] *XTOOL Official Store,* Amazon, https://www.amazon.com/sp?ie=UTF8&seller=A278PTXFISOP9X&asin=B09KT9XNML&ref_=dp_merchant_link&isAmazonFulfilled=1.




31. As another example, Defendant has an official online store with Walmart.[3] Through the official XTOOL Walmart store, which is available to and accessed by users, customers, and potential customers of Defendant in this State and in this District, the Accused Products are sold, offered for sale, and advertised to consumers in this State and this District. On information and belief, Defendant has the belief and expectation that the Accused Products will be purchased by consumers in this State and in this District.

32. As a further example, Defendant has an official online store with eBay.[4] Through the official XTOOL eBay store, which is available to and accessed by users, customers, and potential customers of Defendant in this State and in this District, the Accused Products are sold, offered for sale, and advertised to consumers in this State and this District. On information and belief, Defendant has the belief and expectation that the Accused Products will be purchased by consumers in this State and in this District.

---

[3] *Seller StoreFront - XTOOL*, Walmart, https://www.walmart.com/seller/101136711.
[4] *XTOOL - Official Store*, eBay, https://www.ebay.com/str/sal8559?_tab=about.




33. Using their extensive, national distribution channels, Defendant's direct and indirect customers directly or indirectly, import, ship, distribute, offer for sale, sell, and advertise the Accused Products in the U.S., this State, and this District.

34. Defendant therefore knows, expects, intends, and desires that the Accused Products will be sold in the U.S., this State, and this District for use in the U.S., this State, and this District.

35. Further, on information and belief, this Court has personal jurisdiction over Defendant at least by virtue of Federal Rule of Civil Procedure 4(k)(2).

36. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c) because the Defendant is a foreign company that may be sued in any judicial district, including this District.

## THE ASSERTED PATENTS

### The ’903 Patent

37. U.S. Patent No. 7,592,903 (the “’903 Patent”), entitled “Tire pressure monitor system tool with re-learn and diagnostic procedures,” was duly and legally issued on September 22, 2009. A true and correct copy of the ’903 Patent is appended hereto as Exhibit A.

38. Bosch Automotive is the owner by assignment of all right, title and interest in and to the ’903 Patent, including the right to assert all causes of action arising under said patent and the right to any remedies for infringement of it, including the right to sue for and collect past damages.

39. The ’903 Patent addresses technical problems with then-existing vehicle diagnostic systems. For example, a tire pressure monitoring system (“TPMS”) sensor could transmit tire-condition information together with an identifier. The vehicle’s electronic control unit (“ECU”) compared the transmitted identifier with stored identification information and associated that identifier with a particular tire location, such as the right-front wheel. But installing, replacing, or rotating tires or replacing a sensor caused errors in the association. At least one known approach to correct these errors required placing the vehicle in a learn mode via actuation of pushbutton(s) on an operator-accessible information panel of the vehicle and then using a strong magnet near each tire to cause the associated sensor to transmit a learn-mode signal. This approach had multiple drawbacks, including, but not limited to: complexity of use given that the pushbutton sequence to initiate learn mode was vehicle-specific and complicated; additional tooling requirements, including a separate magnet for calibration that could be lost, rendering the system unusable; and likelihood of errors caused by steel wheels, which could shield magnetic energy, preventing the magnetic field from activating the tire transmitter, or interference and crosstalk in magnetic

initiation, particularly where many tire monitors were assembled near one another. *See, e.g.*, ’903 Patent, 1:29–3:11.

40. The ’903 Patent discloses novel tools and techniques for resetting and diagnosing tire pressure monitor systems that address these technical problems through technological solutions that were neither well-understood, routine, or conventional.

41. For example, Claim 13 of the ’903 Patent recites:

> A method of communicating with a tire pressure monitor system comprising:
>
> requesting vehicle data of a vehicle;
>
> accessing stored tire pressure monitor system information;
>
> determining whether at least a portion of the tire pressure monitor system information is associated with the vehicle data;
>
> determining whether the tire pressure monitor system information comprises at least one of a reset procedure and a diagnostic procedure associated with the tire pressure monitor system;
>
> communicating with an electronic control unit of the vehicle;
>
> initiating at least one tire pressure sensor provided on at least wheel of the vehicle enabling the at least one tire pressure sensor to communicate with the electronic control unit;
>
> providing feedback to a user of the tire pressure monitor system indicating that the at least one sensor has been initiated; and
>
> simulating the at least one tire pressure sensor validate that the tire pressure monitor system is functional.

42. The technical solution provided by Claim 13 of the ’903 Patent results in, for example, a vehicle-aware TPMS service method that reliably establishes communication between a particular wheel-mounted sensor and the vehicle ECU, guides the system through the appropriate vehicle-specific procedure, confirms successful sensor initiation, and independently validates the functionality of the TPMS despite differences among vehicles and sensor systems.

43. The ’903 Patent is valid and enforceable and directed to patentable subject matter.

44. A person of ordinary skill in the art reading the ’903 Patent and its claims would understand that the disclosure and claims of the ’903 Patent are drawn to solving specific, technical problems arising in the area of tire pressure monitoring, and that the invention provides for advancements in the field that, as of the filing date, were not routine, well-understood or conventional.

45. The asserted claims of the ’903 Patent recite a combination of elements sufficient to ensure that the claim in practice amounts to significantly more than a patent claiming an abstract concept. A person of ordinary skill in the art would understand that the ordered combination of claim elements is inventive. Further, the claimed improvements over prior art tire pressure monitoring systems are concrete and improve the capabilities of existing methods.

**The ’320 Patent**

46. U.S. Patent No. 8,072,320 (the “’320 Patent”), entitled “Tire pressure monitor system tool with vehicle entry system,” was duly and legally issued on December 6, 2011. A true and correct copy of the ’320 Patent is appended hereto as Exhibit B.

47. Bosch Automotive is the owner by assignment of all right, title and interest in and to the ’320 Patent, including the right to assert all causes of action arising under said patent and the right to any remedies for infringement of it, including the right to sue for and collect past damages.

48. The ’320 Patent addresses technical problems with then-existing vehicle diagnostic systems. For example, tire pressure monitoring system (“TPMS”) procedures required a tool to determine which TPMS information, procedures, and communication protocols corresponded to a particular vehicle before the tool could effectively communicate with and service the TPMS, which created significant complexity given the number of different vehicles having different TPMS modules and communication protocols. *See, e.g.*, ’320 Patent, 3:1-11. One known approach to

address these requirements was for technicians to follow a complex procedure of manually identifying and performing vehicle-specific learn-mode activation procedures such as entering a pushbutton sequence via an operator-accessible information panel of the vehicle and using a magnet to initiate transmitter relearning. *See, e.g.*, ’320 Patent at 2:7-16.

49. The ’320 Patent discloses novel tools and techniques for processing information from a vehicle and connecting to the vehicle’s tire pressure monitor system using the required communication protocol, which address these technical problems through technical solutions that were neither well-understood, routine, or conventional. *See, e.g.*, ’320 Patent, Abstract, 3:18-45.

50. For example, Claim 15 of the ’320 Patent recites:

> A method of using a tire pressure monitoring tool, comprising:
>
> requesting a vehicle data using a display on the monitoring tool;
>
> receiving the requested vehicle data;
>
> accessing a tire pressure monitoring system from a memory of the tool, the memory storing a plurality of tire pressure monitoring systems; and
>
> determining the tire pressure monitoring system used by a vehicle based on the vehicle data.

51. Further, Claim 16 of the ’320 Patent recites:

> The method of claim 15 further comprising:
>
> accessing the memory for a communication protocol from a plurality of communication protocols used by the tire pressure monitoring systems; and
>
> communicating with an electronic control unit of the vehicle using the communication protocol of the determined tire pressure monitoring system.

52. The technical solutions provided by Claims 15 and 16 of the ’320 Patent result in, for example, an improvement in the operation and interoperability of TPMS service tools, including the ability for a single tool to communicate with many TPMSs and eliminate the need for separate tools or manual identification efforts and manually entering vehicle-specific learn mode activation pushbutton sequences.

53. The ’320 Patent is valid and enforceable and directed to patentable subject matter.

54. A person of ordinary skill in the art reading the ’320 Patent and its claims would understand that the disclosure and claims of the ’320 Patent are drawn to solving specific, technical problems arising in the area of tire pressure monitoring system tools, and that the invention provides for advancements in the field that, as of the filing date, were not routine, well-understood or conventional.

55. The asserted claims of the ’320 Patent recite a combination of elements sufficient to ensure that the claim in practice amounts to significantly more than a patent claiming an abstract concept. A person of ordinary skill in the art would understand that the ordered combination of claim elements is inventive. Further, the claimed improvements over prior art tire pressure monitoring methods are concrete and improve the capabilities of existing methods.

**The ’622 Patent**

56. U.S. Patent No. 8,396,622 (the “’622 Patent”), entitled “Customizable initiation of data recordings,” was duly and legally issued on March 12, 2013. A true and correct copy of the ’622 Patent is appended hereto as Exhibit C.

57. Bosch Automotive is the owner by assignment of all right, title and interest in and to the ’622 Patent, including the right to assert all causes of action arising under said patent and the right to any remedies for infringement of it, including the right to sue for and collect past damages.

58. The ’622 Patent addresses technical problems with then-existing vehicle diagnostic systems, including, but not limited to, a “lack of control in the recording and therefore a reduction in the quality of the recording,” a need to accommodate for “greater flexibility and accuracy in the recordings,” and a need to have a “more efficient manner of recording vehicle operation.” *See, e.g.*, ’622 Patent, 2:17-23.

59. The ’622 Patent discloses novel tools and techniques for customizing and focusing the initiation of vehicle diagnostic data recordings that address these technical problems through technical solutions that were neither well-understood, routine, or conventional. *See, e.g.*, ’622 Patent, Abstract, 2:28-45.

60. For example, Claim 9 of the ’622 Patent recites:

> A method for vehicle diagnostics, comprising:
>
> storing software on a computer readable media, configurable for setting up recording of vehicle operations;
>
> selecting from a plurality of customizable initialization operations according to Boolean logic;
>
> setting up for recording of the vehicle operations through the software;
>
> recording operational status information of a vehicle according to selected triggering operations and Boolean logic; and
>
> extracting and reviewing the recorded information through the stored software.

61. The technical solution provided by Claim 9 of the ’622 Patent results in, for example, improved data relevance and reliability, reduced unnecessary recording, reduced memory burden, reduced power consumption, and faster diagnosis. *See*, *e.g.*, ’622 Patent, 4:22-30; 6:4-24.

62. The ’622 Patent is valid and enforceable and directed to patentable subject matter.

63. A person of ordinary skill in the art reading the ’622 Patent and its claims would understand that the disclosure and claims of the ’622 Patent are drawn to solving specific, technical problems arising in the area of vehicle diagnostic data recording, and that the invention provides for advancements in the field that, as of the filing date, were not routine, well-understood or conventional.

64. The asserted claims of the ’622 Patent recite a combination of elements sufficient to ensure that the claim in practice amounts to significantly more than a patent claiming an abstract concept. A person of ordinary skill in the art would understand that the ordered combination of claim elements is inventive. Further, the claimed improvements over prior art vehicle diagnostic recording methods are concrete and improve the capabilities of existing methods.

**The ’028 Patent**

65. U.S. Patent No. 7,987,028 (the “’028 Patent”), entitled “Method and apparatus for reading and erasing diagnostic trouble codes from a vehicle,” was duly and legally issued on July 26, 2011. A true and correct copy of the ’028 Patent is appended hereto as Exhibit D.

66. Bosch Automotive is the owner by assignment of all right, title and interest in and to the ’028 Patent, including the right to assert all causes of action arising under said patent and the right to any remedies for infringement of it, including the right to sue for and collect past damages.

67. The ’028 Patent addresses technical problems with then-existing vehicle diagnostic systems. For example, vehicles include numerous onboard control modules each capable of generating diagnostic trouble codes (“DTCs”). A single vehicle fault may cause multiple control modules to each generate DTCs corresponding to the same underlying issue. For example, some sensors or equipment in a vehicle may be common to several systems in the vehicle. Therefore, when a problem arises with one of those sensors, the numerous systems that share it may generate their own various DTCs. When DTCs were generated by different vehicular systems indicating a fault in the vehicle, a technician would not know which, if any, were duplicate DTCs, resulting in increased time and cost to diagnose and remove the duplicate DTCs during repair. *See, e.g.*, ’028 Patent, 1:15-28; 1:66-2:20.

68. The ’028 Patent discloses novel tools and techniques for processing diagnostic trouble codes from a vehicle to address these technical problems through technical solutions that were neither well-understood, routine, or conventional. *See, e.g.*, ’028 Patent, Abstract, 1:5-11, 2:30-48.

69. For example, Claim 9 of the ’028 Patent recites:

> A method of erasing duplicate diagnostic trouble codes from a vehicle, comprising:
>
> communicating with vehicle onboard computer systems using a diagnostic tool;
>
> retrieving diagnostic trouble codes stored in multiple vehicle onboard computer systems with the diagnostic tool;
>
> determining whether duplicate diagnostic trouble codes exists;
>
> clearing any duplicate diagnostic trouble codes; and
>
> selecting all vehicle onboard computer systems from which to erase codes.

70. The technical solution provided by Claim 9 of the ’028 Patent results in, for example, efficient management of DTCs distributed across multiple vehicle diagnostic modules by automatically identifying duplicate fault information and ensuring complete removal of corresponding DTCs from all relevant vehicle systems, reducing diagnostic time. *See, e.g.*, ’028 Patent, 7:1-24; 2:16-26; 6:45-62. Further, the technical solution provided by Claim 9 of the ’028 Patent results in, for example, added flexibility and granularity in diagnostic procedures by checking the vehicle’s diagnostic systems for all DTCs that are present while also providing the option of selecting particular systems as the technician desires. *See, e.g.*, ’028 Patent at 4:23-30.

71. The ’028 Patent is valid and enforceable and directed to patentable subject matter.

72. A person of ordinary skill in the art reading the ’028 Patent and its claims would understand that the disclosure and claims of the ’028 Patent are drawn to solving specific, technical problems arising in the area of vehicle diagnostic trouble code management, and that the invention

provides for advancements in the field that, as of the filing date, were not routine, well-understood or conventional.

73. The asserted claims of the ’028 Patent recite a combination of elements sufficient to ensure that the claim in practice amounts to significantly more than a patent claiming an abstract concept. A person of ordinary skill in the art would understand that the ordered combination of claim elements is inventive. Further, the claimed improvements over prior art vehicle diagnostic methods are concrete and improve the capabilities of existing methods.

**The ’145 Patent**

74. U.S. Patent No. 8,473,145 (the “’145 Patent”), entitled “Code evaluator tool with urgency indicator,” was duly and legally issued on June 25, 2013. A true and correct copy of the ’145 Patent is appended hereto as Exhibit E.

75. Bosch Automotive is the owner by assignment of all right, title and interest in and to the ’145 Patent, including the right to assert all causes of action arising under said patent and the right to any remedies for infringement of it, including the right to sue for and collect past damages.

76. The ’145 Patent addresses technical problems with then-existing vehicle diagnostic systems. For example, on-board diagnostic II (“OBD II”) systems stored diagnostic trouble codes (“DTCs”) and illuminated a malfunction indicator lamp when faults were detected. Drivers frequently were not aware, however, whether the condition corresponding to the indicator lamp was serious, whether continued operation was safe, or how quickly repairs needed to be performed. *See, e.g.*, ’145 Patent, 1:20-48.

77. The ’145 Patent discloses novel tools and techniques for determining and communicating repair urgency based on vehicle diagnostic trouble codes that address these

technical problems through technical solutions that were neither well-understood, routine, or conventional. *See, e.g.*, ’145 Patent, Abstract, 1:60-2:10.

78. For example, Claim 8 of the ’145 Patent recites:

> A method of indicating an urgency repair level of a vehicle, comprising:
>
> connecting a diagnostic tool to a data link connector in the vehicle, wherein the diagnostic tool includes an indicator that indicates a level of urgency related to a condition of the vehicle based on a stored diagnostic trouble code (DTC);
>
> powering on the vehicle in order to retrieve diagnostic trouble code (DTC);
>
> retrieving the DTC and the level of urgency from a database stored in a vehicle diagnostic computer wherein the level of urgency is determined from a pool of information related to vehicle service;
>
> displaying on a display a summary of the DTC retrieved;
>
> indicating with an indicator the level of urgency of repairs for each DTC retrieved, wherein the level of urgency takes the form of multiple levels of urgency and the indicator displayed is distinct for each of the multiple levels of urgency and corresponds only with that level of urgency; and
>
> indicating with words a suggested action based on the DTC.

79. The technical solution provided by Claim 8 of the ’145 Patent results in, for example, a specialized automotive diagnostic process that retrieves diagnostic fault information from a vehicle, correlates that information with a vehicle-service knowledge base containing DTC-specific urgency assessments, and generates and communicates a vehicle-condition evaluation through distinct urgency indicators and corrective-action recommendations. *See, e.g.*, ’145 Patent at 4:4-9. The claim therefore addresses a technological problem arising in vehicle diagnostic systems: raw DTC information does not communicate repair urgency or drivability risk. By converting vehicle-generated diagnostic information into DTC-specific urgency classifications obtained from a technical vehicle-service database and presenting those classifications through

dedicated indicators, the claim improves the usability and effectiveness of automotive diagnostic systems and constitutes a practical application of vehicle diagnostic technology.

80. The ’145 Patent is valid and enforceable and directed to patentable subject matter.

81. A person of ordinary skill in the art reading the ’145 Patent and its claims would understand that the disclosure and claims of the ’145 Patent are drawn to solving specific, technical problems arising in the area of vehicle diagnostics, and that the invention provides for advancements in the field that, as of the filing date, were not routine, well-understood or conventional.

82. The asserted claims of the ’145 Patent recite a combination of elements sufficient to ensure that the claim in practice amounts to significantly more than a patent claiming an abstract concept. A person of ordinary skill in the art would understand that the ordered combination of claim elements is inventive. Further, the claimed improvements over prior art vehicle diagnostic systems are concrete and improve the capabilities of existing methods.

**COUNT I: INFRINGEMENT OF U.S. PATENT NO. 7,592,903**

83. Bosch Automotive incorporates the allegations of all foregoing paragraphs as if fully restated herein.

84. Defendant has directly infringed, and continues to directly infringe, the ’903 Patent in violation of 35 U.S.C. § 271(a) at least by using, selling, offering to sell, making, and importing in or into the U.S., without authorization, the Accused Products that practice at least Claim 13 of the ’903 Patent literally or under the doctrine of equivalents. Defendant’s infringement is performed directly, or through its subsidiaries or agents, by selling, offering to sell, making, importing, using, testing (including for purposes of FCC authorization), or demonstrating the Accused Products that practice at least Claim 13 of the ’903 Patent.

85. Those Accused Products that infringe Claim 13 include at least the Accused Tire Pressure Scanners, and any other substantially similar products that infringe in the same or similar way as described herein (collectively, "Accused '903 Products").

86. The Accused '903 Products meet all the limitations of at least Claim 13 of the '903 Patent. Exhibit F to this Complaint is a claim chart showing a non-limiting example of how Defendant's TP150 meets every limitation of Claim 13 literally or under the doctrine of equivalents.

87. On information and belief, the Accused Product addressed in Exhibit F is representative of the other Accused '903 Products in that they are reasonably similar and infringe in the same way. For example, the other Accused '903 Products include similar components that provide the same or similar functions in a similar manner.

88. Defendant also indirectly infringes at least Claim 13 of the '903 Patent in violation of 35 U.S.C. §§ 271(b) and (c).

89. On information and belief, Defendant was aware of the '903 Patent and its infringement of the '903 Patent before the filing of this Complaint. Bosch Automotive notified Defendant of Bosch Automotive patents relating to vehicle diagnostic tools and Defendant's infringement of those patents prior to the filing of the Complaint. On information and belief, as a result, Defendant or its agents studied Bosch Automotive's patent portfolio and became aware of the '903 Patent and Defendant's infringement of that patent. At the very least Defendant was willfully blind to that infringement. Even before Bosch Automotive notified Defendant of its patents, on information and belief, Defendant had a subjective belief of a high probability that its vehicle diagnostic devices infringed Bosch Automotive's patent rights. Upon entering the U.S. market, on information and belief, Defendant learned that vehicle diagnostic device technology was patent-intensive and that Bosch Automotive had a significant patent portfolio related to that

technology that presented a high probability of infringement by the Accused ’903 Products. Therefore, to the extent Defendant claims it did not know of its infringement of the ’903 Patent, Defendant must have taken deliberate actions to avoid learning of Bosch Automotive’s rights by maintaining a policy or practice against investigating third-party patents applicable to its products. Defendant’s deliberate avoidance of confirming what it subjectively believed to be highly probable constitutes willful blindness sufficient to establish knowledge of the ’903 Patent.

90. Defendant has also been aware of the ’903 Patent and its infringement of the ’903 Patent as of at least the filing of this Complaint.

91. Defendant is also liable for inducing infringement of the ’903 Patent under 35 U.S.C. § 271(b). As alleged above, on information and belief, Defendant had knowledge of the ’903 Patent and that its conduct would induce infringement, through its discussions with Bosch Automotive and/or through willful blindness. Defendant sells, offers for sale, imports, makes, and distributes the Accused ’903 Products together with product manuals, quick start guides, and technical documentation that instruct customers how to use the Accused ’903 Products in an infringing manner. *See* Exhibit F (citing materials that direct end users to commit patent infringement). Defendant also operates a YouTube channel[5] and publishes videos that demonstrate the infringing operation of the Accused ’903 Products, including instructional videos, testing demonstrations, and maintenance tutorials that show customers, step-by-step, how to use the products’ infringing features. At the XTOOL websites and stores, Defendant publishes upgrade guides, informative articles, and promotional materials that direct customers to use the Accused ’903 Products in ways that infringe the ’903 Patent. Defendant provides after-sales support and customer service through these same channels, responding to customer inquiries by directing them to operate the Accused ’903 Products in an infringing manner. Defendant also instructs its

[5] *XTOOLonline*, YouTube, https://www.youtube.com/@xtoolonline.

subsidiaries, affiliates, and distributors to sell and market the Accused ’903 Products using these same materials. As set forth in Exhibit F, the Accused ’903 Products practice the technology claimed by the ’903 Patent when operated according to Defendant’s instructions. Accordingly, when customers follow Defendant’s manuals, videos, and instructions, they directly infringe the ’903 Patent.

92. Defendant has also contributed to the direct infringement of at least Claim 13 of the ’903 Patent under 35 U.S.C. § 271(c), and continues to do so. As alleged above, on information and belief, Defendant had knowledge of the ’903 Patent through its discussions with Bosch Automotive and/or through willful blindness. Defendant sells, offers to sell, makes, and imports the Accused ’903 Products, which are themselves, and contain specialized components that are, especially made and adapted to perform the method claimed in Claim 13 of the ’903 Patent, as shown in Exhibit F. The Accused ’903 Products and/or their specialized components constitute a material part of the claimed invention; without them, end users cannot practice the patented method. The Accused ’903 Products and/or their specialized components are not staple articles of commerce and have no substantial noninfringing use; the Accused ’903 Products and/or their specialized components exist specifically to perform the method claimed in the ’903 Patent.

93. Defendant’s infringement of the ’903 Patent has been and continues to be willful. Defendant deliberately infringed and continues to infringe the ’903 Patent despite knowing of its infringement of the ’903 Patent. Further, Defendant has deliberately continued to encourage others’ infringement of the ’903 Patent, including by continuing to take active steps to encourage and facilitate direct infringement by third parties, including customers, users, partners, and affiliates, in the U.S., as described herein.

94. As a result of Defendant’s infringement of the ’903 Patent, Bosch Automotive has been and continues to be irreparably injured with respect to its business and intellectual property

rights and is entitled to recover past damages, including its lost profits, for such injuries pursuant to 35 U.S.C. § 284.

**COUNT II: INFRINGEMENT OF U.S. PATENT NO. 8,072,320**

95. Bosch Automotive incorporates the allegations of all foregoing paragraphs as if fully restated herein.

96. Defendant has directly infringed, and continues to directly infringe, the ’320 Patent in violation of 35 U.S.C. § 271(a) at least by using, selling, offering to sell, making, and importing in or into the U.S., without authorization, the Accused Products that practice at least Claims 15 and 16 of the ’320 Patent literally or under the doctrine of equivalents. Defendant’s infringement is performed directly, or through its subsidiaries or agents, by selling, offering to sell, making, importing, using, testing (including for purposes of FCC authorization), or demonstrating the Accused Products that practice at least Claims 15 and 16 of the ’320 Patent.

97. Those Accused Products that infringe Claims 15 and 16 include at least the Accused Tire Pressure Scanners, Accused Diagnostic D Series, Accused Diagnostic IP Series, Accused Gasoline Diagnostic Series, Accused EV Diagnostic Series, Accused Key Programmers, A30, A30 PRO, A30M V2.0, A30D, A80, A80 PRO, A80 PRO MASTER, and any other substantially similar products that infringe in the same or similar way as described herein (collectively, “Accused ’320 Products”).

98. The Accused ’320 Products meet all the limitations of at least Claims 15 and 16 of the ’320 Patent. Exhibit G to this Complaint is a claim chart showing a non-limiting example of how Defendant’s IP919 PRO meets every limitation of Claims 15 and 16 literally or under the doctrine of equivalents.

99. On information and belief, the Accused ’320 Product addressed in Exhibit G is representative of the other Accused ’320 Products in that they are reasonably similar and infringe

in the same way. For example, the other Accused ’320 Products include similar components that provide the same or similar functions in a similar manner.

100. Defendant also indirectly infringes at least Claims 15 and 16 of the ’320 Patent in violation of 35 U.S.C. §§ 271(b) and (c).

101. On information and belief, Defendant was aware of the ’320 Patent and its infringement of the ’320 Patent before the filing of this Complaint. Bosch Automotive notified Defendant of Bosch Automotive patents relating to vehicle diagnostic tools and Defendant’s infringement of those patents prior to the filing of the Complaint. On information and belief, as a result, Defendant or its agents studied Bosch Automotive’s patent portfolio and became aware of the ’320 Patent and Defendant’s infringement of that patent. At the very least Defendant was willfully blind to that infringement. Even before Bosch Automotive notified Defendant of its patents, on information and belief, Defendant had a subjective belief of a high probability that its vehicle diagnostic devices infringed Bosch Automotive’s patent rights. Upon entering the U.S. market, on information and belief, Defendant learned that vehicle diagnostic device technology was patent-intensive and that Bosch Automotive had a significant patent portfolio related to that technology that presented a high probability of infringement by the Accused ’320 Products. Therefore, to the extent Defendant claims it did not know of its infringement of the ’320 Patent, Defendant must have taken deliberate actions to avoid learning of Bosch Automotive’s rights by maintaining a policy or practice against investigating third-party patents applicable to its products. Defendant’s deliberate avoidance of confirming what it subjectively believed to be highly probable constitutes willful blindness sufficient to establish knowledge of the ’320 Patent.

102. Defendant has also been aware of the ’320 Patent and its infringement of the ’320 Patent as of at least the filing of this Complaint.

103. Defendant is also liable for inducing infringement of the ’320 Patent under 35 U.S.C. § 271(b). As alleged above, on information and belief, Defendant had knowledge of the ’320 Patent and that its conduct would induce infringement, through its discussions with Bosch Automotive and/or through willful blindness. Defendant sells, offers for sale, imports, makes, and distributes the Accused ’320 Products together with product manuals, quick start guides, and technical documentation that instruct customers how to use the Accused ’320 Products in an infringing manner. *See* Exhibit G (citing materials that direct end users to commit patent infringement). Defendant also operates a YouTube channel[6] and publishes videos that demonstrate the infringing operation of the Accused ’320 Products, including instructional videos, testing demonstrations, and maintenance tutorials that show customers, step-by-step, how to use the products’ infringing features. At the XTOOL websites and stores, Defendant publishes upgrade guides, informative articles, and promotional materials that direct customers to use the Accused ’320 Products in ways that infringe the ’320 Patent. Defendant provides after-sales support and customer service through these same channels, responding to customer inquiries by directing them to operate the Accused ’320 Products in an infringing manner. Defendant also instructs its subsidiaries, affiliates, and distributors to sell and market the Accused ’320 Products using these same materials. As set forth in Exhibit G, the Accused ’320 Products practice the technology claimed by the ’320 Patent when operated according to Defendant’s instructions. Accordingly, when customers follow Defendant’s manuals, videos, and instructions, they directly infringe the ’320 Patent.

104. Defendant has also contributed to the direct infringement of at least Claims 15 and 16 of the ’320 Patent under 35 U.S.C. § 271(c), and continues to do so. As alleged above, on information and belief, Defendant had knowledge of the ’320 Patent through its discussions with

[6] *XTOOLonline*, YouTube, https://www.youtube.com/@xtoolonline.

Bosch Automotive and/or through willful blindness. Defendant sells, offers to sell, makes, and imports the Accused ’320 Products, which are themselves, and contain specialized components that are, especially made and adapted to perform the method claimed in Claims 15 and 16 of the ’320 Patent, as shown in Exhibit G. The Accused ’320 Products and/or their specialized components constitute a material part of the claimed invention; without them, end users cannot practice the patented method. The Accused ’320 Products and/or their specialized components are not staple articles of commerce and have no substantial noninfringing use; the Accused ’320 Products and/or their specialized components exist specifically to perform the method claimed in the ’320 Patent.

105. Defendant’s infringement of the ’320 Patent has been and continues to be willful. Defendant deliberately infringed and continues to infringe the ’320 Patent despite knowing of its infringement of the ’320 Patent. Further, Defendant has deliberately continued to encourage others’ infringement of the ’320 Patent, including by continuing to take active steps to encourage and facilitate direct infringement by third parties, including customers, users, partners, and affiliates, in the U.S., as described herein.

106. As a result of Defendant’s infringement of the ’320 Patent, Bosch Automotive has been and continues to be irreparably injured with respect to its business and intellectual property rights and is entitled to recover past damages, including its lost profits, for such injuries pursuant to 35 U.S.C. § 284.

**COUNT III: INFRINGEMENT OF U.S. PATENT NO. 8,396,622**

107. Bosch Automotive incorporates the allegations of all foregoing paragraphs as if fully restated herein.

108. Defendant has directly infringed, and continues to directly infringe, the ’622 Patent in violation of 35 U.S.C. § 271(a) at least by using, selling, offering to sell, making, and importing

in or into the U.S., without authorization, the Accused Products that practice at least Claim 9 of the ’622 Patent literally or under the doctrine of equivalents. Defendant’s infringement is performed directly, or through its subsidiaries or agents, by selling, offering to sell, making, importing, using, testing (including for purposes of FCC authorization), or demonstrating the Accused Products that practice at least Claim 9 of the ’622 Patent.

109. Those Accused Products that infringe Claim 9 include at least the Accused Diagnostic D Series, Accused Diagnostic A Series, Accused Diagnostic IP Series, Accused Gasoline Diagnostic Series, Accused EV Diagnostic Series, Accused Key Programmers, and any other substantially similar products that infringe in the same or similar way as described herein (collectively, “Accused ’622 Products”).

110. The Accused ’622 Products meet all the limitations of at least Claim 9 of the ’622 Patent. Exhibit H to this Complaint is a claim chart showing a non-limiting example of how Defendant’s D8S meets every limitation of Claim 9 literally or under the doctrine of equivalents.

111. On information and belief, the Accused ’622 Product addressed in Exhibit H is representative of the other Accused ’622 Products in that they are reasonably similar and infringe in the same way. For example, the other Accused ’622 Products include similar components that provide the same or similar functions in a similar manner.

112. Defendant also indirectly infringes at least Claim 9 of the ’622 Patent in violation of 35 U.S.C. §§ 271(b) and (c).

113. On information and belief, Defendant was aware of the ’622 Patent and its infringement of the ’622 Patent before the filing of this Complaint. Bosch Automotive notified Defendant of Bosch Automotive patents relating to vehicle diagnostic tools and Defendant’s infringement of those patents prior to the filing of the Complaint. On information and belief, as a result, Defendant or its agents studied Bosch Automotive’s patent portfolio and became aware of

the ’622 Patent and Defendant’s infringement of that patent. At the very least Defendant was willfully blind to that infringement. Even before Bosch Automotive notified Defendant of its patents, on information and belief, Defendant had a subjective belief of a high probability that its vehicle diagnostic devices infringed Bosch Automotive’s patent rights. Upon entering the U.S. market, on information and belief, Defendant learned that vehicle diagnostic device technology was patent-intensive and that Bosch Automotive had a significant patent portfolio related to that technology that presented a high probability of infringement by the Accused ’622 Products. Therefore, to the extent Defendant claims it did not know of its infringement of the ’622 Patent, Defendant must have taken deliberate actions to avoid learning of Bosch Automotive’s rights by maintaining a policy or practice against investigating third-party patents applicable to its products. Defendant’s deliberate avoidance of confirming what it subjectively believed to be highly probable constitutes willful blindness sufficient to establish knowledge of the ’622 Patent.

114. Defendant has also been aware of the ’622 Patent and its infringement of the ’622 Patent as of at least the filing of this Complaint.

115. Defendant is also liable for inducing infringement of the ’622 Patent under 35 U.S.C. § 271(b). As alleged above, on information and belief, Defendant had knowledge of the ’622 Patent and that its conduct would induce infringement, through its discussions with Bosch Automotive and/or through willful blindness. Defendant sells, offers for sale, imports, makes, and distributes the Accused ’622 Products together with product manuals, quick start guides, and technical documentation that instruct customers how to use the Accused ’622 Products in an infringing manner. *See* Exhibit H (citing materials that direct end users to commit patent infringement). Defendant also operates a YouTube channel[7] and publishes videos that demonstrate the infringing operation of the Accused ’622 Products, including instructional videos, testing

[7] *XTOOLonline*, YouTube, https://www.youtube.com/@xtoolonline.

demonstrations, and maintenance tutorials that show customers, step-by-step, how to use the products' infringing features. At the XTOOL websites and stores, Defendant publishes upgrade guides, informative articles, and promotional materials that direct customers to use the Accused '622 Products in ways that infringe the '622 Patent. Defendant provides after-sales support and customer service through these same channels, responding to customer inquiries by directing them to operate the Accused '622 Products in an infringing manner. Defendant also instructs its subsidiaries, affiliates, and distributors to sell and market the Accused '622 Products using these same materials. As set forth in Exhibit H, the Accused '622 Products practice the technology claimed by the '622 Patent when operated according to Defendant's instructions. Accordingly, when customers follow Defendant's manuals, videos, and instructions, they directly infringe the '622 Patent.

116. Defendant has also contributed to the direct infringement of at least Claim 9 of the '622 Patent under 35 U.S.C. § 271(c), and continues to do so. As alleged above, on information and belief, Defendant had knowledge of the '622 Patent through its discussions with Bosch Automotive and/or through willful blindness. Defendant sells, offers to sell, makes, and imports the Accused '622 Products, which are themselves, and contain specialized components that are, especially made and adapted to perform the method claimed in Claim 9 of the '622 Patent, as shown in Exhibit H. The Accused '622 Products and/or their specialized components constitute a material part of the claimed invention; without them, end users cannot practice the patented method. The Accused '622 Products and/or their specialized components are not staple articles of commerce and have no substantial noninfringing use; the Accused '622 Products and/or their specialized components exist specifically to perform the method claimed in the '622 Patent.

117. Defendant's infringement of the '622 Patent has been and continues to be willful. Defendant deliberately infringed and continues to infringe the '622 Patent despite knowing of its

infringement of the ’622 Patent. Further, Defendant has deliberately continued to encourage others’ infringement of the ’622 Patent, including by continuing to take active steps to encourage and facilitate direct infringement by third parties, including customers, users, partners, and affiliates, in the U.S., as described herein.

118. As a result of Defendant’s infringement of the ’622 Patent, Bosch Automotive has been and continues to be irreparably injured with respect to its business and intellectual property rights and is entitled to recover past damages, including its lost profits, for such injuries pursuant to 35 U.S.C. § 284.

**COUNT IV: INFRINGEMENT OF U.S. PATENT NO. 7,987,028**

119. Bosch Automotive incorporates the allegations of all foregoing paragraphs as if fully restated herein.

120. Defendant has directly infringed, and continues to directly infringe, the ’028 Patent in violation of 35 U.S.C. § 271(a) at least by using, selling, offering to sell, making, and importing in or into the U.S., without authorization, the Accused Products that practice at least Claim 9 of the ’028 Patent literally or under the doctrine of equivalents. Defendant’s infringement is performed directly, or through its subsidiaries or agents, by selling, offering to sell, making, importing, using, testing (including for purposes of FCC authorization), or demonstrating the Accused Products that practice at least Claim 9 of the ’028 Patent.

121. Those Accused Products that infringe Claim 9 include at least the Accused Diagnostic D Series, Accused Diagnostic IP Series, Accused Gasoline Diagnostic Series, Accused EV Diagnostic Series, Accused Key Programmers, A30, A30M V2.0, A30D, A80, A80 PRO, A80 PRO MASTER, and any other substantially similar products that infringe in the same or similar way as described herein (collectively, “Accused ’028 Products”).

122. The Accused ’028 Products meet all the limitations of at least Claim 9 of the ’028 Patent. Exhibit I to this Complaint is a claim chart showing a non-limiting example of how Defendant’s D7 meets every limitation of Claim 9 literally or under the doctrine of equivalents.

123. On information and belief, the Accused Product addressed in Exhibit I is representative of the other Accused ’028 Products in that they are reasonably similar and infringe in the same way. For example, the other Accused ’028 Products include similar components that provide the same or similar functions in a similar manner.

124. Defendant also indirectly infringes at least Claim 9 of the ’028 Patent in violation of 35 U.S.C. §§ 271(b) and (c).

125. On information and belief, Defendant was aware of the ’028 Patent and its infringement of the ’028 Patent before the filing of this Complaint. Bosch Automotive notified Defendant of Bosch Automotive patents relating to vehicle diagnostic tools and Defendant’s infringement of those patents prior to the filing of the Complaint. On information and belief, as a result, Defendant or its agents studied Bosch Automotive’s patent portfolio and became aware of the ’028 Patent and Defendant’s infringement of that patent. At the very least Defendant was willfully blind to that infringement. Even before Bosch Automotive notified Defendant of its patents, on information and belief, Defendant had a subjective belief of a high probability that its vehicle diagnostic devices infringed Bosch Automotive’s patent rights. Upon entering the U.S. market, on information and belief, Defendant learned that vehicle diagnostic device technology was patent-intensive and that Bosch Automotive had a significant patent portfolio related to that technology that presented a high probability of infringement by the Accused ’028 Products. Therefore, to the extent Defendant claims it did not know of its infringement of the ’028 Patent, Defendant must have taken deliberate actions to avoid learning of Bosch Automotive’s rights by maintaining a policy or practice against investigating third-party patents applicable to its products.

Defendant's deliberate avoidance of confirming what it subjectively believed to be highly probable constitutes willful blindness sufficient to establish knowledge of the '028 Patent.

126. Defendant has also been aware of the '028 Patent and its infringement of the '028 Patent as of at least the filing of this Complaint.

127. Defendant is also liable for inducing infringement of the '028 Patent under 35 U.S.C. § 271(b). As alleged above, on information and belief, Defendant had knowledge of the '028 Patent and that its conduct would induce infringement, through its discussions with Bosch Automotive and/or through willful blindness. Defendant sells, offers for sale, imports, makes, and distributes the Accused '028 Products together with product manuals, quick start guides, and technical documentation that instruct customers how to use the Accused '028 Products in an infringing manner. *See* Exhibit I (citing materials that direct end users to commit patent infringement). Defendant also operates a YouTube channel[8] and publishes videos that demonstrate the infringing operation of the Accused '028 Products, including instructional videos, testing demonstrations, and maintenance tutorials that show customers, step-by-step, how to use the products' infringing features. At the XTOOL websites and stores, Defendant publishes upgrade guides, informative articles, and promotional materials that direct customers to use the Accused '028 Products in ways that infringe the '028 Patent. Defendant provides after-sales support and customer service through these same channels, responding to customer inquiries by directing them to operate the Accused '028 Products in an infringing manner. Defendant also instructs its subsidiaries, affiliates, and distributors to sell and market the Accused '028 Products using these same materials. As set forth in Exhibit I, the Accused '028 Products practice the technology claimed by the '028 Patent when operated according to Defendant's instructions. Accordingly,

---

[8] *XTOOLonline*, YouTube, https://www.youtube.com/@xtoolonline.

when customers follow Defendant's manuals, videos, and instructions, they directly infringe the '028 Patent.

128. Defendant has also contributed to the direct infringement of at least Claim 9 of the '028 Patent under 35 U.S.C. § 271(c), and continues to do so. As alleged above, on information and belief, Defendant had knowledge of the '028 Patent through its discussions with Bosch Automotive and/or through willful blindness. Defendant sells, offers to sell, makes, and imports the Accused '028 Products, which are themselves, and contain specialized components that are, especially made and adapted to perform the method claimed in Claim 9 of the '028 Patent, as shown in Exhibit I. The Accused '028 Products and/or their specialized components constitute a material part of the claimed invention; without them, end users cannot practice the patented method. The Accused '028 Products and/or their specialized components are not staple articles of commerce and have no substantial noninfringing use; the Accused '028 Products and/or their specialized components exist specifically to perform the method claimed in the '028 Patent.

129. Defendant's infringement of the '028 Patent has been and continues to be willful. Defendant deliberately infringed and continues to infringe the '028 Patent despite knowing of its infringement of the '028 Patent. Further, Defendant has deliberately continued to encourage others' infringement of the '028 Patent, including by continuing to take active steps to encourage and facilitate direct infringement by third parties, including customers, users, partners, and affiliates, in the U.S., as described herein.

130. As a result of Defendant's infringement of the '028 Patent, Bosch Automotive has been and continues to be irreparably injured with respect to its business and intellectual property rights and is entitled to recover past damages, including its lost profits, for such injuries pursuant to 35 U.S.C. § 284.

## COUNT V: INFRINGEMENT OF U.S. PATENT NO. 8,473,145

131. Bosch Automotive incorporates the allegations of all foregoing paragraphs as if fully restated herein.

132. Defendant has directly infringed, and continues to directly infringe, the ’145 Patent in violation of 35 U.S.C. § 271(a) at least by using, selling, offering to sell, making, and importing in or into the U.S., without authorization, the Accused Products that practice at least Claim 8 of the ’145 Patent literally or under the doctrine of equivalents. Defendant’s infringement is performed directly, or through its subsidiaries or agents, by selling, offering to sell, making, importing, using, testing (including for purposes of FCC authorization), or demonstrating the Accused Products that practice at least Claim 8 of the ’145 Patent.

133. Those Accused Products include at least the AD20, AD20 PRO, D7S, D7, D7W, D8W, D8S, IP900S, IP900BT, and any other substantially similar products that infringe in the same or similar way as described herein (collectively, “Accused ’145 Products”).

134. The Accused ’145 Products meet all the limitations of at least Claim 8 of the ’145 Patent. Exhibit J to this Complaint is a claim chart showing a non-limiting example of how Defendant’s AD20 PRO meets every limitation of Claim 8 literally or under the doctrine of equivalents.

135. On information and belief, the Accused Product addressed in Exhibit J is representative of the other Accused ’145 Products in that they are reasonably similar and infringe in the same way. For example, the other Accused ’145 Products include similar components that provide the same or similar functions in a similar manner, including but not limited to XTOOL’s AI Assistant.

136. Defendant also indirectly infringes at least Claim 8 of the ’145 Patent in violation of 35 U.S.C. §§ 271(b) and (c).

137. On information and belief, Defendant was aware of the ’145 Patent and its infringement of the ’145 Patent before the filing of this Complaint. Bosch Automotive notified Defendant of Bosch Automotive patents relating to vehicle diagnostic tools and Defendant’s infringement of those patents prior to the filing of the Complaint. On information and belief, as a result, Defendant or its agents studied Bosch Automotive’s patent portfolio and became aware of the ’145 Patent and Defendant’s infringement of that patent. At the very least Defendant was willfully blind to that infringement. Even before Bosch Automotive notified Defendant of its patents, on information and belief, Defendant had a subjective belief of a high probability that its vehicle diagnostic devices infringed Bosch Automotive’s patent rights. Upon entering the U.S. market, on information and belief, Defendant learned that vehicle diagnostic device technology was patent-intensive and that Bosch Automotive had a significant patent portfolio related to that technology that presented a high probability of infringement by the Accused ’145 Products. Therefore, to the extent Defendant claims it did not know of its infringement of the ’145 Patent, Defendant must have taken deliberate actions to avoid learning of Bosch Automotive’s rights by maintaining a policy or practice against investigating third-party patents applicable to its products. Defendant’s deliberate avoidance of confirming what it subjectively believed to be highly probable constitutes willful blindness sufficient to establish knowledge of the ’145 Patent.

138. Defendant has also been aware of the ’145 Patent and its infringement of the ’145 Patent as of at least the filing of this Complaint.

139. Defendant is also liable for inducing infringement of the ’145 Patent under 35 U.S.C. § 271(b). As alleged above, on information and belief, Defendant had knowledge of the ’145 Patent and that its conduct would induce infringement, through its discussions with Bosch Automotive and/or through willful blindness. Defendant sells, offers for sale, imports, makes, and distributes the Accused ’145 Products together with product manuals, quick start guides, and

technical documentation that instruct customers how to use the Accused ’145 Products in an infringing manner. *See* Exhibit J (citing materials that direct end users to commit patent infringement). Defendant also operates a YouTube channel[9] and publishes videos that demonstrate the infringing operation of the Accused ’145 Products, including instructional videos, testing demonstrations, and maintenance tutorials that show customers, step-by-step, how to use the products’ infringing features. At the XTOOL websites and stores, Defendant publishes upgrade guides, informative articles, and promotional materials that direct customers to use the Accused ’145 Products in ways that infringe the ’145 Patent. Defendant provides after-sales support and customer service through these same channels, responding to customer inquiries by directing them to operate the Accused ’145 Products in an infringing manner. Defendant also instructs its subsidiaries, affiliates, and distributors to sell and market the Accused ’145 Products using these same materials. As set forth in Exhibit J, the Accused ’145 Products practice the technology claimed by the ’145 Patent when operated according to Defendant’s instructions. Accordingly, when customers follow Defendant’s manuals, videos, and instructions, they directly infringe the ’145 Patent.

140. Defendant has also contributed to the direct infringement of at least Claim 8 of the ’145 Patent under 35 U.S.C. § 271(c), and continues to do so. As alleged above, on information and belief, Defendant had knowledge of the ’145 Patent through its discussions with Bosch Automotive and/or through willful blindness. Defendant sells, offers to sell, makes, and imports the Accused ’145 Products, which are themselves, and contain specialized components that are, especially made and adapted to perform the method claimed in Claim 8 of the ’145 Patent, as shown in Exhibit J. The Accused ’145 Products and/or their specialized components constitute a material part of the claimed invention; without them, end users cannot practice the patented

[9] *XTOOLonline*, YouTube, https://www.youtube.com/@xtoolonline.

method. The Accused ’145 Products and/or their specialized components are not staple articles of commerce and have no substantial noninfringing use; the Accused ’145 Products and/or their specialized components exist specifically to perform the method claimed in the ’145 Patent.

141. Defendant’s infringement of the ’145 Patent has been and continues to be willful. Defendant deliberately infringed and continues to infringe the ’145 Patent despite knowing of the existence of the ’145 Patent and how Defendant infringes, as described herein. Further, Defendant has deliberately continued to encourage others’ infringement of the ’145 Patent, including by continuing to take active steps to encourage and facilitate direct infringement by third parties, including customers, users, partners, and affiliates, in the U.S., as described herein.

142. As a result of Defendant’s infringement of the ’145 Patent, Bosch Automotive has been and continues to be irreparably injured with respect to its business and intellectual property rights and is entitled to recover past damages, including its lost profits, for such injuries pursuant to 35 U.S.C. § 284.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

Bosch Automotive requests judgment against Defendant and that the Court grant Bosch Automotive the following relief:

a) Judgment that Defendant has infringed one or more claims of each of the ’903, ’320, ’622, ’028, and ’145 Patents in violation of 35 U.S.C. § 271(a), (b), and/or (c);

b) Judgment that Defendant’s infringement has been and continues to be willful;

c) Granting an injunction permanently enjoining Defendant, its employees, agents, officers, directors, attorneys, successors, affiliates, subsidiaries, and assigns, and

all of those in active concert and participation with any of the foregoing persons or entities from infringing, contributing to the infringement of, or inducing infringement of one or more of the Asserted Patents;

d) Awarding damages adequate to compensate Bosch Automotive for Defendant's infringement, including lost profits, but in no event less than a reasonable royalty, for Defendant's infringement, including an entry of a judgment that Defendant accounts for and pays Bosch Automotive all damages and costs and pre-judgment and post-judgment interest, pursuant to 35 U.S.C. § 284;

e) Awarding enhanced damages as a result of Defendant's willful infringement;

f) Declaring this case exceptional and awarding Bosch Automotive its reasonable attorney fees, pursuant to 35 U.S.C. § 285; and

g) Awarding such other and further relief as this Court deems just and proper.

Dated: September 17, 2026

Respectfully submitted,

*/s/ Katharine M. Burke*

Katharine M. Burke (Lead Attorney)
DC Bar No. 985333
Samuel L. Kassa
DC Bar No. 187255
BAKER BOTTS L.L.P.
700 K Street, NW
Washington, DC 20001
Tel: (202) 639-7700
Fax: (202) 639-7890
katharine.burke@bakerbotts.com
sam.kassa@bakerbotts.com

Kurt Pankratz
TX Bar No. 24013291
Megan LaDriere White
TX Bar No. 24083348
BAKER BOTTS L.L.P.
2001 Ross Avenue, Suite 900

Dallas, Texas 75201
Tel: (214) 953-6500
Fax: (214) 953-6503
kurt.pankratz@bakerbotts.com
megan.white@bakerbotts.com

Alexis Robison
TX Bar No. 24137217
BAKER BOTTS L.L.P.
401 South 1st Street, Suite 1300
Austin, Texas 78704
Tel: (512) 322-2500
Fax: (512) 322-2501
alexis.robison@bakerbotts.com

Brian J. Hausman
TX Bar No. 24136892
BAKER BOTTS L.L.P.
910 Louisiana Street
Houston, Texas 77002
Tel: (713) 229-1255
Fax: (713) 229-1522
brian.hausman@bakerbotts.com

*Attorneys for Bosch Automotive Service Solutions LLC*